**UNITED STATES of America**

v.

**Edward ZIVE, Defendant.**

**No. 68 Cr. 813.**

United States District Court
S. D. New York.

May 14, 1969.

**1274**

Robert M. Morgenthau, U. S. Atty., for United States of America; John R. Wing, Asst. U. S. Atty., of counsel.

William Esbitt, New York City, for defendant.

WYATT, District Judge.

This is a motion for defendant for an order (a) directing the return of property seized and suppressing it for use as evidence (Fed.R.Crim.P. 41(e)), and (b) directing the United States Attorney to furnish defendant all evidence favorable to him or which would tend to exculpate him.

The indictment charges in one count that on September 17, 1968 defendant gave a bribe to an employee of the Internal Revenue Service (18 U.S.C. § 201(b)) and in a second count that defendant gave a gratuity to such an employee (18 U.S.C. § 201(f); there is a typographical error in the citation to this statute in the indictment). Both counts refer to an audit examination of the 1965 Federal income tax return of defendant.

The second branch of the motion can be disposed of without much difficulty. This second branch of the motion is based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Brady v. Maryland did not deal in any way with pretrial discovery by a defendant nor with any duty of the court in that respect. On the contrary, the discussion was of the duty of the prosecutor, wholly apart from any order of the court. "[N]o pre-trial remedies were intended to be created" by *Brady*. United States v. Manhattan Brush Co., 38 F.R.D. 4, 7 (S.D.N.Y.1965) (Palmieri, J.).

Moreover, the Supreme Court prescribed amendments to the Rules of Criminal Procedure, effective July 1, 1966, or somewhat more than three years after the *Brady* decision. These amendments were specifically intended "to expand the scope of pretrial discovery". Advisory Committee's Note to Rule 16. Yet there was no provision for any such pretrial discovery as is here sought, and Brady v. Maryland was not even mentioned in the Notes (which contained many citations). The motion in this aspect is denied.

The first branch of the motion is more difficult and a hearing was held on April 11 and 17, 1969, at which testimony and other evidence was taken.

The facts do not appear to be in dispute.

Toward the end of August 1968, Internal Revenue Agent Katz was making an audit of the Federal income tax returns of defendant Zive for the years 1965 and 1966. Katz had been assigned these two years but during his audit he added 1967 as another year.

Zive was in the scrap metal business at 175th Street and Webster Avenue in the Bronx. He did business as an individual proprietor, using the trade name "Zive Metal Company".

Katz reported to Inspector Litwack that during the audit he examined invoices from the 15 or 20 sellers of metal to Zive and attempted to verify their names on the invoices from the telephone directory; that he could not find them listed; that he then questioned Zive; that Zive told him these sellers did not want to give their names but that he (Zive) was obliged by City regulations to keep records and therefore had used fictitious names in his records; that Zive said that everything in the records about the purchases was accurate except the names; that Zive told him he had to make payoffs to police officers and other City officials and had hidden these payoffs in his records by falsifying purchase prices of items; that he (Katz) saw Zive make such a payoff; and that Zive had suggested a payment to Katz as a reward for overlooking the fictitious name invoices. Katz also reported that Zive expressed apprehension that Katz might be "bugged" when he came back; further that Zive kept a gun in his office. Katz stated a belief that Zive might have omitted income from his returns and perhaps had committed tax fraud.

Katz telephoned Zive and made an appointment to see him on September 17, 1968.

On the morning of September 17 Katz was fitted out with a transmitter concealed on his person. He then went to Zive's office. Nearby were eight inspectors or agents in four automobiles with receiving and recording equipment. The idea was to pick up the conversation between Zive and Katz, transmitted by the equipment concealed on the person of Katz. It was anticipated that Zive would pay a bribe to Katz. The number of cars and agents was due to fear that interference from traffic and other causes would make reception in some spots difficult.

The Zive-Katz conversation was received and recorded in the waiting cars. One of the cars was parked at the back of a gas station near Zive's office. While the monitoring was going on, a man who was thought to be either an employee of Zive or of the gas station, came up to this car and observed the recording equipment. Also during this period, the inspectors noticed a number of police cars cruising in the area; this gave the inspectors some concern because of the reported payoffs by Zive.

At about eleven o'clock that morning, Katz left Zive's office and met the inspectors a few blocks away in Echo Place. Katz reported that Zive had given him $2500 to overlook the fictitious name invoices and to make an audit report without questioning those invoices. He produced twenty-five $100 bills which he said had been given him by Zive. Katz reported that there were two female employees then in Zive's office and two male visitors. Katz and one of the inspectors then left the area with the money.

Inspector Litwack was in charge of the seven remaining inspectors. He announced that he would arrest Zive at once and make a search at the same time for the gun and for books and records pertaining to Zive and his business for the three years 1965, 1966 and 1967, for "whatever was considered evidence, possible or probable evidence of probative value" (SM 87) as to "the crime of bribery and possible tax fraud" (SM 88).

Three of the inspectors went to Zive's office. Litwack identified himself,

placed Zive under arrest for bribery, and advised him of his constitutional rights. Two other inspectors stayed outside Zive's office with the object of preventing customers from entering. The other two inspectors waited about five minutes and then joined the first three inspectors in Zive's office.

An inspector asked Zive where his gun was. Zive pointed to the open middle (shallow) desk drawer and produced a pistol permit. The inspector pulled out the pistol, unloaded it, and later (when they left the office) replaced the pistol in the drawer, and also near it the ammunition.

Zive's office was about 35 feet long by 15 feet wide. There was a desk in front and Zive's desk was in the rear. By a wall was a four drawer file cabinet, on top of which were various books.

Litwack and two other inspectors searched Zive's desk, the top of the filing cabinet and three of the file drawers. The search lasted about 25 minutes

Books and records were seized during the search. No inventory was made at the time but at the request of counsel for defendant a list of what was seized was given by the United States Attorney on September 27, 1968. This list contained numbered items and reference hereafter to what was seized is by item number and description from such list.

A single sheet of paper with handwriting was seized by Litwack from the top of Zive's desk, this for the reason that it was believed to reflect gambling transactions in violation of New York law. This paper was not included in the list of numbered items mentioned above.

From the shallow middle drawer of Zive's desk, Litwack seized the following:

2. Three Bronx Savings Bank Account Books in the name of Edward I. Zive:

Account No. 348247
248248
348249

4. Folder of customer's copy of check deposits from Chase Manhattan Bank in the name of Zive Metal Company

16. Certificate of ownership of 500 shares of Consolidated Edison Company of America—LO 49057

17. Seven stock forms from Blair & Co.

During the search the following items were seized:

14. Will

19. Assorted letters, poems and other papers

These items were probably taken by Litwack from Zive's desk. In any event Litwack testified (and there is no reason to disbelieve him) that these items must have been mixed in with other papers and that there was no conscious selection of them for seizure.

After a search of the middle desk drawer, Litwack found that the three drawers on the left side of the desk would not open. Zive was asked to open these drawers. He telephoned to his lawyer and he and one of the inspectors talked to the lawyer. After this, Zive opened the three left drawers and Litwack searched them.

In the top drawer, there was about $13,000 in currency which was not taken.

In the middle drawer were seven bags of what seemed to be a silver alloy. These were seized and were described in the list as "seven bags * * * of unknown substance" (item 20).

In the bottom drawer was a square metal box of a substance which looked like silver. This was seized and described in the list as "one box of unknown substance" (item 20).

Two inspectors, Redmond and Coote, came into Zive's office about 5 minutes after the arrest. They searched for "any of the books that related to the tax years that were under examination by Revenue Agent Katz" (SM 102). They went to the file cabinet by the left wall and seized books and papers from the top of the

cabinet and from three of its four drawers. They thus seized the following:

1. Three books of check stubs:
   (a) 6/16/65—3/1/66
   (b) 3/1/66—12/9/66
   (c) 12/12/66—10/16/67
3. Five daily record of client record books covering period from 11/24/65 to 4/3/68
5. Nine petty cash ledgers covering period from May 16, 1964 to May 14, 1968
6. General Ledger starting March 9, 1961
7. Cash Receipts book from March 1961 to December 1965
8. Cash Receipts Book—1966
9. General Ledger—1967
10. General Ledger and Journal 1966
11. Cash disbursements from March 1, 1961 to December 1965
12. Petty cash from March 1961 to December 1965
13. Cash Disbursements 1966
21. Work sheets and trial balance of Zive Metal Company
22. Asserted tax and employment records in a manila folder

Either Litwack or Redmond or Coote also seized the following:

15. Deposit slips of Heidi-Dee Realty Co.
18. Money orders drawn on Chase Manhattan Bank

When Litwack felt that the search at Zive's office was ended, the inspectors and Zive went downtown to the office of the regional inspector. There Zive was required to empty his pockets and an address book was then seized.

About a week later, the government returned to Zive the property described above as items 2, 4, 14, 15, 16, 19, 21 and 22. The other seized property is the subject of the present motion.

Admittedly the search was for evidence only. The evidence for which the inspectors were searching was evidence of undisclosed income to, and tax fraud

by, Zive. They felt that this would supply a motive for offering a bribe to Katz, as well as establish some other offense. They seized the piece of paper from the top of the desk and the address book for a different reason: as evidence of a violation of New York City gambling laws. The seven bags of silver substance and the metal box were also seized for a different reason: a belief that they were stolen.

█ There is no question but that the arrest of Zive without a warrant was lawful, there having been probable cause to believe that he had committed the offense of bribery. Undoubtedly, as an incident of his arrest, a reasonable search could have been made for weapons, contraband, the fruits of the crime and the instrumentalities of the crime. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The search in such cases is justified "in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody". Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 745 (1925). The same justification is the basis for the provisions of Rule 41(b) of the Federal Rules of Criminal Procedure.

After the arrest of Zive, there was a search for weapons but nothing was seized during that search.

█ The arrest was for bribery. No contraband was involved and there were no fruits nor instrumentalities of the crime of bribery, nor any search therefor. The search was for evidence only— not for direct evidence of the bribery offense but for evidence of a different offense, tax fraud, to serve as circumstantial evidence—by supplying a motive— of the offense of bribery. There was no search warrant.

The issue of law thus posed in the case at bar is of some difficulty.

It is true that Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) upheld the seizure of evidence to prove crime. See also United States v. Bennett, 409 F.2d 888 (2d Cir., 1969)

It is also noted that in the Omnibus Crime Control and Safe Streets Act of 1968, effective June 19, 1968, there was a provision (18 U.S.C. § 3103a) authorizing the issuance of a warrant "to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States". See 114 Cong.Rec. S6283–84 (daily ed. May 23, 1968)

In Warden v. Hayden, however, the *object* of the search was not evidence but weapons, as the Court was at pains to emphasize (387 U.S. at 299, 300, 87 S.Ct. 1642). In United States v. Bennett, the search was "for the instrumentalities used in a ramified narcotics conspiracy and for evidence thereof", was "for narcotics * * * for weapons, and also * * * for evidence * * *".

No decision has been found upholding a seizure of evidence during a search solely for evidence, as here.

What was done here seems precisely what Judge Learned Hand described as "rummaging about among his effects to secure evidence against him". United States v. Poller, 43 F.2d 911, 914 (2d Cir. 1930)

There was no emergency or other reason which made necessary a search without a warrant. This is not a controlling criterion, according to the decision in United States v. Rabinowitz but the dissent to that decision by Mr. Justice Frankfurter (joined by Mr. Justice Jackson) argues powerfully in this regard (339 U.S. at 84–85, 70 S.Ct. 430).

The majority in United States v. Rabinowitz made the reasonableness of a search and seizure depend upon "the facts and circumstances—the total atmosphere of the case" (339 U.S. at 66, 70 S.Ct. at 435). By this standard the search and seizure in the case at bar were unreasonable and in violation of the rights of Zive under the Fourth Amendment.

The motion is granted. The government is directed to return to defendant any items seized which have not already been returned. All papers which were seized on September 17, 1968 are suppressed for use as evidence.

So ordered.